UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff(s), )<br>)<br>vs. )<br>)<br>TOMMY JAMES PERRY, )<br>)<br>Defendant(s). ) | Case No. 1:11CR 117 SNLJ |

## **REPORT AND RECOMMENDATION**

Tommy James Perry has filed Defendant's Motion to Suppress Statements (Document #23) asking that any incriminating statements made by Tommy James Perry be suppressed. As grounds, the defendant alleges:

1. Any oral and recorded statements as may have been made by this Defendant were involuntary, were elicited by coercion, and were elicited without the Defendant being fully advised of and afforded his rights under the Fifth Amendment of the United States Constitution, and said statements are therefore involuntary and inadmissible.

2. Any oral or written statements as may have been made by this Defendant were elicited as a result of an unlawful arrest and are therefore inadmissible.

3. Any testimony or other evidence relating to or based upon said statements were obtained as a direct result of the violation of Defendant's rights under the Fifth Amendment, as noted above, and are therefore inadmissible.

## **Factual Background**

Just after midnight on June 16, 2011, someone called the Williamsville Police Department and

reported shots fired near the area of 2nd Street in Williamsville, Missouri. Williamsville Police Officer Louis Warmack responded, along with Wayne County Deputy Mark Young.

Officers made contact with Keith Garrett on the front porch of his home near 2nd Street. They asked Garrett if he had heard any shots in that area. Garrett responded that Tommy Perry had shot at him three times and that he grabbed a .410 gauge shotgun and fired one shot into the ground to scare Perry off. The officers asked Keith Garrett to tell them what had happened that night.

Garrett reported that Tommy Perry lived next door to Garrett with Garrett's ex-wife, Kristi Garrett. On this particular evening, Kristi Garrett and Tommy Perry had been at Keith Garrett's house. Tommy and Kristi left and went to their home. Shortly after that, Keith Garrett heard screams coming from Perry's house. Keith Garrett ran over to that house and found Tommy Perry beating Kristi Garrett. Keith Garrett then fought with Tommy Perry. Perry fled from the home. Keith Garrett took Kristi Garrett to his house and cleaned the blood off her face. A while later, Perry came back in another vehicle. Perry got out of that vehicle and fired three shots at the Garrett residence. One of those shots struck Garrett's car and the other two shots struck Garrett's front porch. Keith Garrett grabbed a .410 shotgun near his front door and fired a shot into the ground to try and scare Perry off.

Officer Warmack was speaking to Keith Garrett on Garrett's front porch when Tommy Perry called Garrett's phone. Garrett answered. Warmack heard Tommy Perry screaming into the phone, "I'm not done with you yet; I'll get you." Warmack took the phone and told Perry to put his gun up and come to talk with him.

The officers received information that Perry was riding in a white truck owned by his father, Clanton Perry, when the shots were fired. Warmack and Yount went to Clanton Perry's home in

Wayne County. The officers met with Donald Ross at Clanton Perry's home. Ross said that just before the shooting, Tommy Perry had arrived at the Clanton Perry home and wanted to borrow a firearm. Ross did not want to give him any firearms, but Perry demanded access to his father's guns. Ross eventually gave in and allowed Perry to take two firearms from the house. Those two firearms were a shotgun and a rifle. Perry then forced Ross to drive him back to the Keith Garrett home. Ross said he did not witness any shooting at the Garrett house by Perry. After the shooting, Perry was driven back to the Clanton Perry home by Ross. Perry then took the two firearms that he took to the Garrett house and ran into the woods. Shortly after that, the officers arrived at the Clanton Perry home.

Mark Young and Louis Warmack returned to the Keith Garrett home to collect evidence. They found a shell casing about 150 feet from the front of the Garrett residence. The officers also observed bullet holes in Keith Garrett's vehicle and front porch. After investigating further at the scene, the officers returned to Clanton Perry's home to see if Tommy Perry had come back to the home. As they arrived, the officers saw Tommy Perry jump out of a window of the home and run away. Officers made contact with Donald Ross, who was complaining that Tommy Perry had assaulted him by striking Ross on his back with a firearm. Ross had a large bruise on his back that he said was caused by the assault. Ross said that Tommy Perry had left without taking any firearms. The officers found the two firearms that Tommy Perry had used on a couch in the home. Ross stated that those were the two firearms that Tommy Perry had taken to the Keith Garrett home. Those firearms were seized, along with a third firearm. Ross had requested that the officers take the third gun because he did not want the gun to be in the home if Tommy Perry returned.

The officers also noticed that the shell casing found at Keith Garrett's home matched the type

of ammunition found in one of the firearms seized at Clanton Perry's home. On June 16, 2011, Rebecca Alsup gave a written statement to the officers. Alsup stated that she was present during the shooting and that Tommy Perry shot at the Keith Garrett home.

On June 28, 2011, Tommy Perry was arrested on state charges related to the shooting at Keith Garrett's home. On July 14, 2011, ATF Special Agent David Diveley interviewed Perry at the Wayne County Sheriff's Office. That interview was audio-recorded. Prior to the interview, Diveley administered a Miranda warning to Perry. Perry stated that he understood his rights. Perry answered questions put to him by Diveley. At first, Perry claimed that he did not remember the events on the night of the shooting. Perry was returned to his cell after a short discussion about federal penalties for being a felon in possession of a firearm. Before Diveley could leave, Perry requested a second interview. During that interview, Perry admitted that he had shot at Keith Garrett three times, that he had taken the firearms used in the shooting from his father's house, that one of the firearms was a shotgun and the other a rifle, and that Perry had shot all three firearms seized from his father's house during the past year. Perry stated that he pointed the rifle at Keith Garrett's chest, but it did not function. He said that he tried to shoot the rifle two times, before switching to the shotgun. Perry stated that he did not know how he missed Garrett when he shot at him.

## **Discussion**

The defendant identifies the interview he is specifically referring to in the following summary:

> On July 14, 2011, Bureau of Alcohol, Tobacco, Firearms and Explosives Agent David Diveley interviewed Defendant Tommy James Perry. The interview took place at the Wayne County Sheriff's Department. Defendant allegedly made several incriminating statements during this interview. Defendant allegedly admitted

to "technically" owning at least one firearm, allegedly admitted to shooting several firearms, and allegedly admitted to shooting at an individual, Keith Garrett.

Agent David Diveley of the Bureau of Alcohol, Tobacco, Firearms and Explosives interviewed the defendant on July 14, 2011. "Mr. Perry had been arrested by the Wayne County authorities for shooting at his neighbor and was a felon in possession of a firearm." (Tr. 4). In these words, Agent Diveley explained the reason why he went to see Mr. Perry. Agent Diveley was accompanied by Wayne County Deputy Sheriff Gary McQuitty. The interview was recorded. A CD disc of the interview was admitted into evidence at the evidentiary hearing as Government's Exhibit #1.

At the beginning of the interview, Agent Diveley advised Mr. Perry of the Miranda warning. (Tr. 5). When asked if Mr. Perry responded in any way as to his understanding of the rights, Agent Diveley answered, "He understood his rights and continued to speak to me about this case."

Agent Diveley testified that all of the interview is included on the CD marked as Exhibit #1. Actually, there were two interviews. At the evidentiary hearing, Agent Diveley explained the sequence:

A   The first time, he came in and said that he didn't remember all the details, and then whenever - - he kept asking me, you know, how much time was he looking at, how much time was he looking at, and I advised him that he was looking at a 10-year maximum but, you know, probably in the five to eight-year range. He left and then he came back, and while Deputy McQuitty was taking him back downstairs, he said, "No, I want to go back there and talk to him and tell the whole truth." So this time,

he came back in, we turned on the recorder again, and this time, he admitted to
shooting at Mr. Garrett and possessing the three firearms.

(Tr. 7).

During the interview, Diveley told Perry that he was looking a ten-year maximum, but the actual sentence could be in the five to eight-year range. Diveley testified that, at that time, that is what Diveley believed and gave the following reason for that belief. "He told me that he had two felony convictions, one for witness tampering and one for, I believe, assault in the state of Oregon." (Tr. 7-8).

It turned out, as a factual matter, that Mr. Perry had more convictions than that; and, as a result, he could be an armed career criminal, which would draw a minimum of fifteen years and a maximum of life. (Tr. 8). Diveley believed, at the time of his testimony, that he explained during the interview with Mr. Perry what Perry's punishment would be if he had three prior violent felonies. He testified that, if that were the case, then Perry's sentence would be fifteen years to life in the federal system. Id. Perry expressed that he wanted his case to remain at or go to the federal level. Id.

Agent Diveley and Deputy McQuitty were armed, but they did not draw their weapons out of the holsters. Diveley expressed the fact that Perry probably had leg irons on, but Diveley could not remember whether Perry was handcuffed. Diveley expressed the opinion that the tenor of the conversation between Mr. Perry and himself in the following words, "It was cordial, just matter-of-fact speaking, like we're speaking here." (Tr. 9). Diveley stated he told Perry that he could not promise anything, but he could advise him what the maximum punishment was. At the end of the first interview, he informed Perry that Diveley did not believe he was being truthful. Id. In Diveley's opinion, that statement led to the second interview.

On cross-examination, Agent Diveley stated that the recorder for the interview was turned on before Mr. Perry entered the room. (Tr. 11). At the conclusion of the first interview, the recorder was turned off when Mr. Perry was walking out. Diveley indicated he thought the amount of time that had passed between the end of the first interview and the beginning of the second interview was approximately five minutes. Id. Diveley testified that until officers received the documentation back from the State of Oregon, they did not realize what Mr. Perry's full criminal history was. (Tr. 14).

In the second interview, Mr. Perry told Agent Diveley that he possessed a firearm. (Tr. 18). He also indicated that he had actually shot at Keith Garrett. These statements were consistent with the version of what happened given by witnesses to the event as contained in their statements to officers or in reports. When Perry came back the second time, he told Diveley that he wanted to come tell the truth now. (Tr. 19).

## Voluntariness of the Defendant's Statements

The contentions of the defendant are all encompassed by the concept of the "voluntariness" of the defendant's statements during the two interviews with Special Agent David Diveley on July 14, 2011. Voluntariness is described in the case of Simmons v. Bowersox, 235 F.3d 1124, 1132-33 (8th Cir. 2001), by telling what it is not:

> A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination. United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). In applying this test, we look at the totality of the circumstances surrounding the interrogation, including law enforcement officials' conduct and the defendant's capacity to resist any pressure. Id. Specifically, we consider factors such as detention length, the repetitive and prolonged nature of questioning, and the accused's age. Bramlett v. Lockhart, 876 F.2d 644, 646 (8th Cir. 1989).
>
> Whatever the facts of an individual case, the pole star always must be to determine whether

or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination. United States v. Le Brun, 363 F.3d 715, 725-26 (8th Cir. 2004) (holding "This is a very demanding standard ....") Cases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare. United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001) (citing Berkemer v. McCarty, 468 U.S. 420, 430, 104 S.Ct. 3148 (1984).

In United States v. Meirovitz, 918 F.2d 1376 (8th Cir. 1990) cert. denied 1991, the Court of Appeals for the Eighth Circuit set out the appropriate test for determining the voluntariness of a confession as "'whether in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.' United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)," 918 F.2d at 1379. In Meirovitz, the Court continued that two factors must be considered in determining whether a suspect's will was overborne and those factors are "'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.' Id. (citing Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515 (1986))."

Considering the facts of the current case in light of the quotation above from Simmons v. Bowersox, the interview of the defendant with Agent Diveley was not extracted by threats, violence or express or implied promises sufficient to overbear his will and critically impair his capacity for self-determination. It is true that Agent Diveley estimated the defendant's maximum punishment at ten years but more likely five to eight years in the federal system. However, this was based upon the information which the defendant gave Diveley, that he had two prior felonies. Diveley also did inform the defendant that if he had three felonies, whether violent felonies or drug cases, then he could be looking at a minimum of fifteen years to life in the federal system.

Returning to the factors outlined in the Simmons case above, specifically, the detention length, the repetitive and prolonged nature of the questioning and the accused's age: the first interview was approximately fifteen minutes (Tr. 13); the second interview, in the words of Agent Diveley, "was much shorter; I would say five to seven minutes" Id.; the questioning was not repetitive or prolonged; at the time of the interview with Agent Diveley, Tommy James Perry was thirty-two years old.

In the Meirovitz case, the two factors to be considered in determining whether a suspect's will was overborne were the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess. There was no improper conduct on behalf of Agent Diveley or Deputy Gary McQuitty. Diveley described the interview as "cordial, just mater-of-fact speaking, as we're speaking here." (Tr. 9).

A significant fact indicating that the defendant's will was not overborne is his statement during the first interview, that he did not remember all the facts that occurred on the night of June 16, 2011. He felt comfortable enough to withhold information which he later revealed. At the end of the first interview, Agent Diveley told Mr. Perry that the agent did not believe he was telling the truth.

It was the defendant's own decision to return for the second interview. Deputy McQuitty came back and told Agent Diveley that Perry wanted to talk to him. When asked if the defendant said why he wanted to talk, Agent Diveley replied, "I think he told me that he wanted to come tell the truth now, something to that effect." (Tr. 19). The defendant's will was not overborne during the two interviews.

Considering the grounds alleged by the defendant for suppression of his statements, that the statements were involuntary, were elicited by coercion and were elicited without the defendant being

fully advised of and afforded his rights under the Fifth Amendment of the United States Constitution, the court finds these statements were voluntary, there was no coercion exercised upon the defendant and the statements were elicited after the defendant had been fully advised of his Miranda rights. Consequently, the defendant's statements were voluntary and admissible.

The defendant's second argument was that the defendant's statements were elicited as a result of an unlawful arrest and, therefore, are inadmissible. On the contrary, as Agent Diveley stated, "Mr. Perry had been arrested by the Wayne County authorities for shooting at his neighbor and was a felon in possession of a firearm." (Tr. 4).

Actually, Mr. Perry was arrested on June 28, 2011, by Louis Warmack, the City Marshal at Williamsville, Missouri. At the evidentiary hearing, Marshal Warmack identified what was marked as Government's Exhibit #2 as an arrest warrant for Mr. Perry. (Tr. 34). Wayne County issued the arrest warrant on June 16, 2011, the day of the assault. Id. Marshal Warmack was present when the defendant was arrested. He explained the circumstances leading up to the arrest as follows:

Marshal Warmack received information that Perry was in his girlfriend's house, which is next door to the Garrett residence, and the marshal contacted a couple of other officers, a Trooper Ayers of the Missouri State Highway Patrol and Deputy Forshey from Wayne County. After speaking with Kristi Garrett, the marshal said they were able to determine that Perry was in the house positively and they walked through the house and found Mr. Perry in the bedroom under the bed.

The defendant was validly arrested on the basis of the arrest warrant issued from Wayne County.

Finally, the defendant claims that any testimony or other evidence relating to or based upon statements of the defendant were obtained as a direct result of the violation of the defendant's rights

under the Fifth Amendment and are, therefore, inadmissible.

The court finds the defendant's rights under the Fifth Amendment were not violated. The defendant's statements were voluntary and followed the administration of the <u>Miranda</u> warnings. No coercion by law enforcement officers was used upon the defendant in order for him to agree to be interviewed.

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Statements (Document #23) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Lewis M. Blanton
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of February, 2012.